CHABOYA (UNITED STATES v.). See Cases Nos. 14,769 and 14,770.

## Case No. 2,568.

### CHACON v. EIGHTY-NINE BALES OF COCHINEAL.

[1 Brock. 478.][1]

Circuit Court, D. Virginia. May Term, 1821.[2]

JURISDICTION—PRIZE—VIOLATION OF NEUTRALITY—CITIZENSHIP—EXPATRIATION — EFFECT OF ENTERING FOREIGN NAVAL SERVICE — PIRACY — LAW OF NATIONS — AUGMENTATION OF FORCE—EVIDENCE—RESTITUTION OF PRIZE CAPTURED IN VIOLATION OF NEUTRALITY.

1. The question, of prize or no prize? belongs exclusively to the courts of the captor; and in no case does a neutral assume the right of deciding it. But offences may be committed by a belligerent against a neutral, in his military operations, which it would be inconsistent with the neutral character to permit; and which give to the other belligerent, the party injured by those operations, claims upon the neutral which he is not at liberty to disregard. In such a situation, the neutral has a double duty to perform; he must vindicate his own rights, and afford redress to the party injured by their violation.

[See note at end of case.]

2. If the wrong-doer comes completely within the power of the neutral, the practice of this government is, to restore the thing wrongfully taken.

3. Quaere: If a native born American citizen can expatriate himself? If he can, he divests himself, by the very act of expatriation, as well of the obligations, as of the rights of a citizen. He becomes, ipso facto, an alien; his lands are escheatable, and the rights appertaining to citizenship, once lost, cannot be recovered by residence, but he must go through the formula prescribed by law, for the naturalization of an alien born.

4. But whether the right of expatriation exists or not, an American citizen may, under the modern usage of nations, enter either the land or naval service of a foreign government without compromising the neutrality of his own, or divesting himself thereby of his rights of citizenship. The application of this general principle to the United States, is not affected by our treaty with Spain. Admitting the capturing vessel to have been a privateer, commissioned by the enemy of Spain, and the captured vessels to have been Spanish property: that a person (a native citizen of the United States,) holding a commission to cruize under the enemy of that power, might be deemed a pirate in the courts of the United States or Spain; still, he would not be so deemed by the rest of the world. Those two powers may bind themselves by treaty, but cannot bind foreign nations; and, though that treaty may affect the individual, (in the case supposed,) personally, it cannot affect the prize. The enemy of Spain had the right, like all other sovereigns, to grant the commission, and captures made under it, are as valid, and vest as completely in the belligerent sovereign, under whose flag they were made, as if the treaty between the United States and Spain had never been made.

5. Neutral rights are not violated by the grant of a commission to a neutral, while within the territory of a belligerent. A commission to cruize, granted in a time of profound peace, but in contemplation of war, may be used after war breaks out. It is sufficient to give validity to captures made under it, that war existed at the time of the capture.

---

[1] [Reported by John W. Brockenbrough.]

[2] [Affirmed in The Santissima Trinidad and The St. Ander, 7 Wheat. (20 U. S.) 283.]

6. Quaere: If a colony in a state of rebellion, and struggling to establish its independence of the parent state, is embraced by the act of congress of 1794, prohibiting the enlistment of soldiers. marines. and seamen. within the limits of the United States, to enter the service of any foreign prince or state?

7. However this may be, such a revolted colony, or section of a state. comes within the more ample provisions of the law of nations: and while neutrals concede to a people in such a situation, the character and rights of a belligerent. if they are in a condition to make war, they are as much bound to refrain from a violation of the rights of neutrals, as if they were an acknowledged state.

8. It seems. that the public, current declarations of a crew, that a large portion of them were enlisted for the cruize, in the United States, in a case where no motives existed for previous combination; and the testimony of the master of the captured vessel. that a portion of the crew spoke English, and that the mate told him, that the vessel was equipped and fitted out in Baltimore, cannot be entirely disregarded.

9. The principle has been well settled by the supreme court, that belligerent captures by privateers, fitted out, armed, and manned within the United States, in violation of the neutrality of our government. and the act of congress, in such case provided, if they are brought within the powers of our courts, may be restored by them to the injured belligerent.

10. And the same principle is applicable to the national ships of a foreign sovereign, whether the capture was made within the waters of the United States, or upon the high seas, and brought within the jurisdiction of the federal courts. The general principle is undeniable, that the national ship of a foreign sovereign, coming within the United States, is exempted from the jurisdiction of the United States, but this exemption is granted only on the condition that the sovereignty of our government shall be respected: and the gross violation of its neutrality by such foreign national ship, forfeits the condition, and subjects her prizes. made in fact through neutral means, to restitution to the original owner.

[Appeal from the district court of the United States for the district of Virginia.]

In admiralty. This was a libel, originally filed in the district court of Norfolk, by the consul of Spain, in April 1817, against eighty-nine bales of cochineal, two bales of jalap, and one box of vanilla. formerly constituting part of the cargoes of the Spanish ships. Santissima Trinidad and St. Ander, and alleged to be unlawfully and piratically taken out of those vessels on the high seas, by a squadron, consisting of two armed vessels, called the Independencia del Sud, and the Altravida, and owned and commanded by persons, assuming themselves to be citizens of the United Provinces of the Rio de la Plata. The libel was filed, in behalf of the original Spanish owners, by Don Pablo Chacon, consul of his catholic majesty, for the port of Norfolk; and, as amended, it insisted upon restitution, principally for three reasons: 1st. That the commanders of the capturing vessels. the Independencia del Sud and the Altravida, were native citizens of the United States, and were prohibited by our treaty with Spain of 1795, from taking commissions to cruize against that power. 2d. That the said capturing vessels were owned in the United States, and were originally equipped, fitted out, armed and manned in the United States, contrary to law. 3d. That their force and armament had been illegally augmented within the United States. A claim and answer was given in by James Chaytor, styling himself Don Diego Chaytor. in which he asserted that he was the commander of the Independencia, that she was a public armed vessel. belonging to the government of the United Provinces of Rio de la Plata, and that he was duly commissioned as her commander: that open war existed between those provinces and Spain: that the property in question was captured by him, as prize of war, on the high seas, and taken out of the Spanish ships, the Santissima Trinidad and the St. Ander, and put on board of the Independencia: and that he afterwards, in March 1817, came into the port of Norfolk with his capturing ship, where he was received and acknowledged as a public ship of war, and the captured property, with the approbation and consent of the government of the United States, was there landed for safe keeping in the custom-house store. The claimant admitted that he was a native citizen of the United States, and that his wife and family had constantly resided in Baltimore; but alleged, that in May 1816, at the city of Buenos Ayres, he accepted a commission under the government of the United Provinces, and then and there expatriated himself by the only means in his power, viz: a formal notification of the fact to the United States consul at that place. He denied that the capturing vessel, the Independencia, was owned in the United States, or that she was fitted out, equipped, or armed, or her force augmented in the ports of the United States, contrary to law. He denied, also, that the Altravida was owned in the United States, or that she was armed, equipped, or fitted out, in the United States, contrary to law; or that she aided in the capture of the vessel in question. He further asserted that the captured property had been libelled. and duly condemned as prize in the tribunal of prizes of the United Provinces, at Buenos Ayres, on the 6th of February, 1818. He denied the illegal enlistment of his crew in the United States; but admitted that several persons there entered themselves on board as seamen, in December 1816, representing themselves to be, and being, as he supposed, citizens of the United Provinces, or in their service, and then transiently in the United States: and that he refused to receive citizens of this country, and actually sent on shore, some who had clandestinely introduced themselves on board.

It appeared, by the evidence in the cause, that the capturing vessel, the Independencia, was originally built and equipped in the port of Baltimore, as a privateer, during the late war between the United States and Great Britain, and was then rigged as a schooner, and called the Mammoth, and was fitted out

to cruize against the enemy. After the peace, she was converted into a brig, and sold by her original owners. In January 1816, she was loaded with a cargo of munitions of war, by her new owners, who were inhabitants of Baltimore, and being armed with twelve guns, part of her original armament, she was sent from that port, under the command of the claimant, Chaytor, ostensibly, on a voyage to the north west coast of America, but in reality to Buenos Ayres. By the written instructions given to the supercargo, on this voyage, he was authorized by the owners, to sell the vessel to the government of Buenos Ayres, if he could obtain a suitable price. She arrived at Buenos Ayres, having committed no act of hostility, but sailing under the protection of the United States flag, during the outward voyage. At Buenos Ayres, the vessel was sold to the claimant, and two other persons, and soon afterwards, in May 1816, assumed the flag and character of a public ship, and was understood by the crew, to have been sold to the government of Buenos Ayres; and the claimant made known these facts to the crew, asserting, that he had become a citizen of Buenos Ayres, and had received a commission to command the vessel as a national ship, and invited the crew to enlist in the same service, and the greater part of them accordingly enlisted. From this period, the public agents of the government of the United States, and other foreign governments, at that port, considered the vessel as a public ship of war, and this was her avowed character and reputation. No bill of sale to the government of Buenos Ayres was produced, but the claimant's commission from that government was given in evidence.

Upon the point of the illegal equipment and augmentation of force of the capturing vessels in the ports of the United States, different witnesses were examined on the part of the libellant, whose testimony was extremely contradictory; but it appeared from the evidence, and was admitted by the claimant, that after the sale in Buenos Ayres, in May 1816, the Independencia departed from that port, under his command, on a cruize against Spain; and after visiting the coast of Spain, put into Baltimore, early in the month of October, in the same year, having then on board, the greater part of her original crew, among which were many citizens of the United States. On her arrival at Baltimore, she was received as a public ship, and underwent considerable repairs in that port. Her bottom was new coppered, some parts of her hull was recaulked, part of her waterways replaced, a new head was put on, some new sails and rigging, to a small amount, and a new mainyard, were obtained; some bolts were driven into the hull, and the mainmast, (which had been shivered by lightning,) was taken out, reduced in length, and replaced in its former station. For the purpose of making these repairs, her guns, ammunition, and cargo, were discharged, under the inspection of an officer of the customs; and when the repairs were made. the armament was replaced, and a report made by the proper officer to the collector, that there was no addition to her armament. The Independencia again left Baltimore, in the latter part of December 1816, having at that time on board, a crew of 112 men; and on or about the 8th of February following. sailed from the capes of the Chesapeake, on the cruize, in which the property in question was captured. During the stay of the Independencia at Baltimore, several persons were enlisted on board her, and the claimant's own witnesses proved, that the number was about thirty. On her departure from Baltimore, the Independencia was accompanied by the Altravida, as a tender or despatch vessel. This last was formerly a privateer, called the Romp, and had been condemned by the district court of Virginia, for illegal conduct, and was sold under the decree of the court, together with the armament and munitions of war, then on board. She was purchased, ostensibly, for one Thomas Taylor, but immediately transferred to the claimant, Chaytor. She soon afterwards went to Baltimore, and was attached to the Independencia, as a tender, having no separate commission, but acting under the authority of the claimant. Some of her guns were mounted, and a crew of about twenty-five men put on board at Baltimore. She dropped down the Patuxent, a few days before the sailing of the Independencia, and was there joined by the latter, and accompanied her on her cruize.

The district court, upon the hearing of the cause, decreed restitution to the original Spanish owners [case not reported], and from that sentence, the claimant, Chaytor, appealed to this court.[3]

The following opinion was delivered by

MARSHALL, Circuit Justice. It is universally admitted, that the question of prize, or no prize, belongs solely to the courts of the captor. In no case, does a neutral assume the right of deciding it. But offences may be committed by a belligerent, against a neutral, in his military operations, which the neutral ought not to permit; and which give claims upon him, to the party injured by those operations, which he is not at liberty to disregard. In such a situation, the course to be pursued by the neutral, to assert his own rights, and perform his duties, by affording redress to the party injured by a violation of those rights, will vary with varying circumstances. If the wrong doer comes completely within his power, and brings that which will afford complete redress for the wrong done, the usage of nations, generally, as is believed, certainly the usage of this nation, is to restore the thing wrongfully tak-

[3] The editor has adopted the accurate statement of Mr. Wheaton. in his report of this same case. See 7 Wheat. [20 U. S.] 283.

-en. This act vindicates the offended dignity of the neutral, and gives to the injured party, the most ample redress, perhaps, which is attainable, or can reasonably be demanded. This ought to satisfy the sovereign, who claims reparation from the neutral, for his involuntary instrumentality in the war; and ought to be submitted to, by the sovereign of the offending party, whose duty it was, to restrain his officer from violating the rights of a friendly government, or to punish him for their violation. This usage, then, is recommended by the strong consideration of convenience and effectiveness. This principle having been adopted by the American government, two questions arise in the case under consideration. 1st. Has the capturing vessel so violated the neutrality of the United States, as to give this government the right, and impose upon it the duty, of restoring to the original owners, when brought within its power, the property which has been taken? 2d. By what department is this right to be exercised? this duty to be performed? Many points have been raised on both sides, and supported with great strength of argument, which on views, which might have been taken of the subject, by the court, it would have been necessary to consider and decide, but which, in the more narrow view that has been taken, need not be considered fully, because they are not necessary to the decision which will be made. These points, therefore, will be noticed very cursorily.

The right of Commodore Chaytor to make prizes, has been denied; because, 1st. he is an American citizen; and, 2dly. his commission does not authorize him to wage war.

1. The commodore, though a native American, insists, that he has expatriated himself, and has become a citizen of Buenos Ayres. I deem it unnecessary, in this case, to discuss the abstract question of this alleged natural right to dissolve the connexion between an individual and his country, and will only observe, that the principle is often of more serious consequence to those who would shield particular acts by its assertion, than they suppose. The individual who divests himself of the obligations of a citizen, if this be within the power of an individual, loses the rights which are connected with those obligations. He becomes an alien. His lands, if he has any, are escheatable. He cannot recover these rights by residence, but must go through that process which the laws prescribe for the naturalization of an alien born. Would Commodore Chaytor wish to place himself in this situation? I decline inquiring whether he has done so, because I think, that an American citizen may, according to the modern usage of nations, engage in foreign service, without compromising the neutrality of his government. I do not perceive any solid distinction between the land and naval service, in this particular. It is probable, that foreign-

ers have less frequently obtained commissions in the marine than in the army; and for this it would not be difficult to account; but in cases where the subjects of the nation are supposed to be defective in maritime skill, as in the Russian service, foreigners are not unfrequently engaged. It has been supposed, that the application of this general principle to Commodore Chaytor, is prevented by our treaty with Spain. I do not think so; even admitting the Independencia del Sud to have been a privateer, and admitting the construction of the treaty, by the counsel for the libellant, to be right, (and I am very far from assenting to it,) the treaty may affect the individual, personally, but cannot affect the prize. Were it true, that a person holding a commission to cruize under the enemy of one of the contracting parties, might be prosecuted as a pirate, in their courts, he would not be deemed a pirate by the rest of the world. America and Spain may bind themselves, but they cannot bind foreign nations. They cannot bind the republic, if it be one, of Rio de la Plata. Pueyrredon had a right to grant this commission at his city of Buenos Ayres; and the world will respect it just as much as if the treaty between the United States and Spain had never been made. As between the government granting the commission, and the person to whom it is granted, it is valid. Captures made under it, will be deemed valid by that government, and by all foreign nations. Such captures vest the prize in the belligerent sovereign, under whose commission it was made; and, however his prize acts, or his edicts, may dispose of it afterwards, the world considers it as his property, taken by himself. We may punish the instrument, personally, if our law directs it; but this does not authorize us to seize the property of a belligerent sovereign, taken jure belli. The only principle on which this can be done, is, that our neutral rights have been violated. Now, the grant of a commission to a neutral, while within the territory of a belligerent, has never been considered as a violation of neutral rights.

2. Neither do I think, the objections to the commission have been sustained. Admitting that Rio de la Plata was not at war with Spain when it was granted, it is not doubted, that if a commission be given in contemplation of war, or in time of profound peace, that commission may be used when war shall break out. War existed at the time of the capture, and that is sufficient for the captor. The commission, in its terms, gives him the command of the Independencia, and so far as respects that vessel, is equivalent to a general commission in the navy; and the instructions authorize him to "cruize," which term strongly indicates hostile operations. But I think that a commission to command a ship of war, authorizes the officer holding it, if not interdicted by other circumstances, to attack and capture

an enemy. It has also been contended that this vessel, which was originally the Mammoth of Baltimore, has not been transferred, with good faith, to the government of Rio de la Plata, but is. in truth, the property of an American citizen. The circumstances in support of this proposition, are certainly entitled to consideration, although they do not outweigh the positive testimony of the transfer. I shall therefore consider the transfer as unimpeached.

The court is now brought to the inquiry, whether the neutrality of the United States has been violated by any equipment, or augmentation of armament, or enlistment of seamen, within their territory? These acts are forbidden to a belligerent, by the law of nations; and are also forbidden by an act of congress. I will put out of the case the equipment in Baltimore, in 1815, for the voyage to Buenos Ayres, in January 1816, because I think the subsequent sale of the vessel authorised the purchaser, if unconnected with the original equipment, to make war upon the enemies of her flag.

I will consider the transactions of Commodore Chaytor, after his arrival in Baltimore, in October, 1816, and will first inquire whether he has enlisted any part of his crew, in violation of the neutral character, and of the laws of the United States.

The act of 1794 enacts, "that if any person shall, within the territory or jurisdiction of the United States, enlist or enter himself, or hire, or retain, another person to enlist or enter himself, or to go beyond the limits, or jurisdiction of the United States, with intent to be enlisted or entered, in the service of any foreign prince or state as a soldier, as a marine, or seaman, on board of any vessel of war, letter of marque or privateer," &c. 1 Story's Laws U. S. p. 352, c. 50, § 2 [1 Stat. 383]. To this clause is added a proviso, which is understood to authorize the enlistment of a transient foreigner to serve on board a ship of war of his own sovereign, not equipped or armed within the United States. The history of the day informs us, that this act was considered as declaratory of the pre-existing law of nations, and was intended to aid the executive in the enforcement of that law. However serious may be the doubt, whether a section of a nation struggling for its independence, may come within the prohibitions of the act, there can be no doubt that such a people come within the more ample provisions of the law of nations. Whether Buenos Ayres be a state or not, if she is in a condition to make war, and to claim the character and rights of a belligerent, she is bound to respect the laws of war; and the government which concedes her those rights, is bound to maintain its own neutrality, unless it means to become a party to the war, as entirely as if she were an acknowledged state. She has no more right to recruit her navy within the United States, than Spain would

have, and this government is as much bound to restrain her from using our strength in the war, as to restrain her enemy. Therefore, if Commodore Chaytor has recruited any men within the United States, not being the subjects or citizens of Rio de la Plata, he has violated their neutrality.

The depositions of Henry, Irvine, and Pecker, are supposed by the counsel for the claimant, to have no bearing on the case, because they detail only what they have heard from others; and I readily admit, that their testimony, standing alone, would not be sufficient to establish the fact of an enlistment within the United States, prior to the capture of the cochineal, mentioned in the libel. But they prove, unequivocally, that Commodore Chaytor did .enlist American citizens, within the United States, for his subsequent cruize; and certainly, positive evidence of this fact, gives, in such a case as this, strong probability to other evidence, which asserts, that the same fact took place, previous to the preceding cruize. They prove also, the current declaration of the crew. that a great number of them were concerned in the preceding cruize, and were enlisted for that cruize, in the United States. I feel some difficulty in totally disregarding these declarations. The private communications of an individual, would certainly be entitled to no consideration; but the public conversation of a ship's crew, relative to the transactions of a ship, in a case where no motives exist for previous combination, will give some belief. Of the same nature, is the testimony of the master of the captured vessel. He says, that the crew of the Independencia spoke English, and that the second officer told him, they had been equipped and fitted out in Baltimore. The testimony of John Davis, is positive; and, if true, establishes every thing for which the libellants contend. This witness is supposed to be discredited by others, who, in some respects, are said to contradict him. Let us examine this subject. Davis swears that he was born in New York. and that he was enlisted in Norfolk, by Hooper, for the Independencia. Currie swears that he is an Englishman, who deserted from an English merchantman, lying in the port of Baltimore, and secreted himself on board the Independencia, until she sailed. It also appears, that Hooper recruited in Baltimore, not in Norfolk. But who is Currie? and what gives him superior credit to Davis? But I waive this inquiry, and will consider how far the repugnancy between their depositions, discredits either. Davis says he was born in New York; and if this be untrue, nothing he says ought to be believed, because, he knowingly asserts a falsehood. Currie says that Davis is an Englishman; and states facts, which may be presumed to be the foundation of his assertion. They are, that he deserted from an English merchantman, and that he had been employed during our war. under the British flag. But seamen, born in England, are

found in American merchantman, and seamen born in New York, may be found on board an English merchantman. The fact of his receiving prize-money, is much stronger, but not conclusive. We have the highest authority for saying, that many of our seamen were impressed, and Davis may be among them. The fact is susceptible of explanation, and might, perhaps, have been explained, had the deposition of Davis been taken, after the statements of Currie were known. But he states, himself, to have enlisted in Norfolk, when it is proved, that he came on board in Baltimore; and Hooper, by whom he says he was engaged, was employed in Baltimore. But how often is it, that the memory errs with respect to unimportant circumstances, but is correct with respect to the principal subject. That Davis was enlisted, and by Hooper, were facts which would make a much stronger impression on his memory, than the place at which he enlisted. Baltimore and Norfolk were equal to him; he was, probably, at both, and might very well have the impression that he enlisted at the one place, when, in truth, he enlisted at the other. A mistake in such a circumstance, when the mind is not called particularly to it, would not, perhaps, invalidate the testimony of a witness whose moral character is not impeached. But let it be, that Davis is to be rejected. The testimony which discredits him, must be believed. That testimony, as well as the admission implied in the questions put by Commodore Chaytor, shows, that Davis was enlisted within the United States; and shows, further, that he was not a subject of Buenos Ayres, but an Englishman. Joseph Smith is proved to be unworthy of credit, but the testimony which discredits him, shows, that he was enlisted with the United States, and is a European Spaniard. Isaac Berry, also proves the whole case; but he is said to have destroyed his whole testimony, by the contradictions beween his first and second depositions. What are those contradictions? In the first, he says that he was shipped by M'Donnel; in his second, by James. Both these men may have kept sailors' houses; both have recruited for Buenos Ayres; both have communicated with Berry; and, certainly, his not recollecting distinctly with which he shipped, the act not always of a sober man, does not prove that he was not shipped at all. The commodore might shake his testimony, on this point, by his muster-roll, or by taking the deposition of those who are alleged to have shipped him, or of some of the crew who would prove, that no such man was on board. But no such testimony is adduced. One Wood, is said, in one deposition, to have been second mate, in another, a midshipman. He might, in the course of the voyage, have been both. But this does not prove that Wood was not on board. He varies in his estimate of the number of the crew. He does not profess to be exact. I do not think

these small variances affect the body of his testimony, especially, as he states a great number of facts which expose him to detection, if he spoke what was untrue. John Harris, also, proves the whole case; but he, too, is said to be unworthy of belief, because he speaks of a forty-two pounder, which had no existence; and because he speaks of eighteen pounders, instead of twelves. There may have been some large piece on board, which was not brought in, though it is not probable; but this man, who has probably sailed in many cruizers, may have confounded what was on board one vessel, with the guns on board another. This mistake, if it be one, might affect very seriously his testimony respecting the armament, but does not destroy his testimony respecting his having been on board, when we recollect that he gives, completely, the means of contradicting him, if he could be contradicted. He names the officers and many of the crew, and says by whom he was enlisted. The muster-roll, or James, or any seaman on board the Independencia, could disprove any untruth he may assert. I cannot, therefore, reject his testimony. John Lewis is discredited, because he says that he is a native American, and is proved to be a Frenchman. I admit that his testimony is to be disregarded, but, still, he was enlisted in the United States, and is not a subject of Buenos Ayres. Matthew Murray proves the case, but is said, in his second deposition, to speak only from hearsay. I disregard entirely the testimony of Edward M'Donnel. His reputation is such as to discredit him completely.

I proceed, now, to the examination of the claimant's testimony. Edward Currie was in the Independencia, while she lay in the port of Baltimore, in 1816, and could have contradicted the enlistments alleged to have been made there, had they been untrue. He speaks only of John Davis. Daniel James discredits M'Donnel. Why was he not examined as to the enlistment of the crew? It is said that he enlisted Berry; why was he not interrogated as to that fact? James Barnes, commander of the Mangoree, says, that the Independencia was fitted, equipped, and manned, as he has understood, in Buenos Ayres, in May 1816; that the ships cruizing under the flag of that republic, of which the Mangoree was one, are manned chiefly by foreign seamen. The Regent, another of these cruizers, he understood to be fitted out, and manned in the port of Baltimore. How the vessels of Buenos Ayres were manned, is, in some measure, stated by other witnesses. Alexander Hunter, a native citizen of the United States, was a sailor on board the Mangoree. Where did he enlist? He does not say, and it is of not much consequence in this case. But he enlisted in the Independencia, in Baltimore. How is this to be justified? He had served the republic in the Mangoree. But did this convert him into a subject of Buenos Ayres, who was not an

inhabitant of the United States? Will it be contended that by enlisting on board one privateer, an American citizen acquires a right to enlist, within his own country, on board any other? The crew, he says, belonged to all nations. They did not belong exclusively to Buenos Ayres. Hugh Cagne says, that he is a native of Ireland, and has been many years in the service of South America. How in her service? He is a seaman, and the fair presumption is, that he served in her marine. What is her marine? We have no reason to presume that it consists of much more than such vessels as the Independencia, the Mangoree, the Altravida, and the Regent, fitted out in other countries, and manned by foreigners. At any rate, he does not state himself to have become a subject of Buenos Ayres, and he does not state himself to have enlisted in Baltimore. He says, that among her crew, were many North Americans, and most of the crew, who came in her from Buenos Ayres. Where did those of her crew, who were North Americans, and who did not come in her from Buenos Ayres, enlist? We are left to conjecture. But what was the condition of that part of the crew, which came into port with her? The greater number of them sailed in her from Baltimore, and were, we must suppose, engaged for the voyage. On their return to port, their engagements terminated, unless others more extensive were made at Buenos Ayres. William Amos has been examined, and gives us some information on this subject. After the sale of the vessel, he says, Captain Chaytor came on board, and told them, they were at liberty to continue in the new service, or to be discharged. They chose to continue. Not one syllable is said of changing their political character, and throwing off their allegiance to the United States. Not one syllable is said of their engaging for a longer time, than till the vessel should return to the United States. We must, then, suppose that they continued citizens, and we have the more reason to believe, that their engagements expired on their return to the United States, because, Amos says he then left the vessel, and because Roe, who shipped at Buenos Ayres, also says that he left her at the same place. The crew, then, which came in her from Buenos Ayres, were American citizens, who, most probably, re-enlisted in Baltimore. Such a re-enlistment, is equivalent to an original enlistment. If they engaged for a longer time in Buenos Ayres, I think it would have been stated. Cagne goes, not to prove the enlistment of strangers, indiscriminately, but that they said they were in the service of the patriots. How in that service? He does not tell us. He does not say, admitting they spoke the truth, that every seaman, who had made a cruize in a privateer, said to be commissioned by any of the patriot governments, did not think himself in the service of the patriots. About fifteen of the crew of the Mangoree, shipped on board of her. All we know of this crew, would lead to the opinion, that they were American, and such other sailors as are found in our ports. They had been in the patriot service, and Captain Chaytor supposed himself authorized by that circumstance, to re-enlist them. But in this he was mistaken. Cagne says, too, that when she left the capes, her crew consisted of about one hundred and twelve, among whom were twenty-eight or thirty new men. Who were they? Are they proved to be citizens of Buenos Ayres, transiently within the United States? He does not pretend that they were. The fair presumption from the whole testimony is, that they consisted of that class of sailors, who are usually employed in privateering. Whether those who had sailed in the Mangoree, were among the number of new men, is not certainly stated; it is probable they were. Cagne states a fact, which is certainly material, in the inquiry, respecting the character of the Independencia. It is, that her crew was enlisted, not for the cruize, but for the year, and were on wages. But he entered the vessel in Baltimore, and does not say, that these were the terms on which the original crew were engaged. It gives some complexion to this transaction, that Cagne says, there were two brigs fitting out in Baltimore, which sailed about the same time with the Independencia, which were said to be intended as cruizers. It illustrates the practice of the place, and aids in informing us, what is understood by being in the patriot service. John H. Speck appears also, to have entered the Independencia in Baltimore, and he agrees in everything with Cagne. About thirty men were enlisted in Baltimore, not one of whom is said to have been a subject of Buenos Ayres; though they all said they had been in the patriot service.

I think, then, the evidence is more complete, than could have been expected, in a case of violation of law, that nearly the whole crew of the Independencia was enlisted within the United States, in violation of the act of congress, and of the neutrality of this government. The prize goods in question, have been taken by a neutral force. I must consider the men who came in the Independencia from Buenos Ayres, and the thirty men engaged in the Chesapeake, as enlisted within the United States, and as being men who could not be lawfully enlisted. It is unnecessary to extend the inquiry to the equipment, or the augmentation of the armament. The enlistment being established, the law is the same, whether those charges be supported or not. It is equally unnecessary to extend the inquiry to the Altravida. The prize having been made, in truth, by neutral means, is it the duty of the government to restore it to the original owner, when it is brought within the power of the United States?

The reasoning in favour of an affirmative answer to this question, appears conclusive. The government is bound to maintain its neutrality; and to prevent a foreign belligerent, from preparing a military force within its territory, to operate against a nation with whom it is at peace. If its means of prevention have been eluded, and its force against its will, been employed by a belligerent, in a manner not authorized by public law, if it has been thus made an instrument of war, the injured belligerent has claims on the neutral government, which has corresponding claims on the aggressing belligerent. If, under such circumstances, the means of obtaining reparation from the one, and of making it to the other, are placed within the power of the neutral, the strongest reasons of convenience, and of justice, seem to require that he should use those means. When a ship of war, which has acquired her military capacities in a neutral country, brings her prize into that country, these plain principles require, that the prize should be restored. In conformity with them, the Grange, captured by the Ambuscade frigate, within the waters of the United States, was restored by the government.

A question of much more difficulty remains to be considered. By what department of the government is this restitution to be made. Without recapitulating much of what has been said at the bar, by stating the reasons on which my opinion is founded, I will acknowledge, that in my private judgment, this right, and this duty devolve on the executive, or legislative, and not on the judicial department. The exercise must be regulated by a discretion, which courts do not possess, and may be controlled by reasons of state, which do not govern tribunals acting on principles of positive law. If, therefore, this was a case in which my own judgment was alone to be consulted, I should, I believe, confine myself to the inquiry, whether any act of congress authorized the restitution sought by the libellants. But this court is not at liberty to decide for itself. It is bound, and ought to be bound, by the decisions of the supreme court, and its judgment must conform to those decisions. They are admitted to have settled the principle, that property captured by privateers, fitted out, armed, or manned, within the ports of the United States, and brought within the power of our courts, may be restored by them to the original owner. It is, however, contended that the same principle does not extend to captures made by national ships. That national ships are in many respects distinguishable from privateers, is not to be denied; is this a case in which a sound distinction can be taken between them? Ships of war and privateers, both cruise under a commission from their sovereign, and both make prizes under the authority of that commission. In both cases, the sovereign is the captor, and the prize vests absolutely in him. The cruizer, in both cases, is a mere instrument of war employed by his sovereign, and the particular interest which the agent may have in the thing acquired, depends on municipal regulations, of which this court can take no notice. The courts of the captor, will in both cases distribute the proceeds according to those municipal regulations, but foreign courts consider the property as the property of the sovereign, and the possession of the captor as the possession of the sovereign. In both cases, then, the foreign court which acts upon the prize, acts on property in the possession of a foreign sovereign, acquired by his authorized agent. In what then does the difference between the right of courts, to interfere with their prizes consist?

We are told that the national ship of war, carries upon its deck a portion of the sovereignty of his prince, and is, of course, inviolable. I am not prepared to say that a privateer, commissioned for the purposes of war, is not equally inviolable, at least so far as respects its military operations. But I will not enter into this inquiry. I will ask, how is this inviolability acquired, and how far does it extend? In the case of The Exchange, 7 Cranch [11 U. S.] 116, the supreme court laid down the principle expressly, that this exemption from the jurisdiction of the nation, in which the national ship of a foreign sovereign is found, is derived, where there is no express compact, from the assent implied in the admission of such vessel into port. But the same case establishes this further principle: that this immunity is granted, on condition that the sovereignty of the place be respected. A breach of the condition, forfeits the immunity depending on it.

A national ship, openly and grossly violating the laws of a neutral government, enlisting a full crew, in opposition to those laws, forfeits the condition on which an exemption from those laws was granted. On this principle, the Grange was restored.[4] The government acts without being charged with a violation of faith. If the government acts, it acts by that department, which is entrusted with the power of inquiring, whether the belligerent has violated those neutral rights which forfeit his prize, and if the courts exercise this power rightfully, in the case of prizes made by privateers, they may, I think, exercise it in the case of prizes made by a national ship, and brought within our territory. If there is fallacy in this reasoning, I do not perceive it. But, supposing it to be applicable to a capture made within our waters, and immediately arrested, it is contended, that it is inapplicable to a capture made on the high seas, and brought within

---

[4] The Grange was a British ship, which had been cleared out from Philadelphia, in 1793, and was captured by the French frigate L'Ambuscade, within the capes of the Delaware, while on her way to the ocean. 2 Marshall's Life of Washington (Rev. Ed.) 262.

our waters. The violation of neutrality gives, it is said, a claim on the sovereign, whose power is an unit, and cannot give rights to seize prizes made by one vessel, more than by another. When the offending vessel comes again into port, she comes in with all the immunities originally attached to her. In theory, this argument is strong; but, practically, it would destroy the efficacy of the principle. It would deprive the neutral government of its power to give specific relief; and seems to me to be as applicable to prizes made by privateers, as by national ships.

Another idea was suggested by the counsel for the claimants, of which I feel the full force. It is, that this application to the neutral sovereign, to vindicate his neutral rights, and repair the wrongs done to a foreign sovereign, must be made by that foreign sovereign himself, through his authorized agent, and not by a private individual. Were I to admit this, the question immediately occurs—Does not this objection go as strongly to the restoration of prizes made by privateers, as to the restoration of prizes made by national ships? I am not sure, that I am master of that train of reasoning, which has conducted the supreme court, to the assertion of that jurisdiction over prizes made by privateers, which has been exercised. If I were, I should not attempt to give it, because it will be stated more ably by those who are themselves convinced of its propriety. I content myself with saying, that I think the principles on which prizes made by privateers, have been restored, apply to prizes made by national ships, who have violated the neutrality of the United States, and I, therefore, hold myself bound to restore in this case. The sentence of the district court is affirmed.

NOTE [from original report]. This cause was carried by appeal to the supreme court of the United States. It was argued with distinguished ability, both in the circuit and supreme court, and the sentence of the circuit court was unanimously affirmed by the supreme court. See [The Santissima Trinidad] 7 Wheat. [20 U. S.] 283.

[NOTE. Mr. Justice Story delivered the opinion of the supreme court, and after stating that the commission of the Independencia was complete proof that she was a public ship; that the production of the bill of sale was unnecessary; that Buenos Ayres was to be deemed a belligerent nation; that captures made by her public vessels were to be regarded as having the same validity and possessing the same immunities claimed by public ships under the law of nations; and that the arming and supplying the Independencia with munitions of war, and forwarding her for sale to Buenos Ayres, was a commercial adventure, contraband, but in no sense a violation of the laws or neutrality of the United States,—assigned the following grounds for affirmance: That although the testimony as to illegal equipment and augmentation of force adduced by libellant was unsatisfactory and contradictory, and evidently false in some particulars, yet there were other proofs, from independent sources, which clearly established the violation of neutrality beyond all reasonable doubt. That the enlistment of men for the Independencia at Baltimore was a clear augmentation of force within the United States, and consequently a violation of the neutrality laws. That the evidence clearly showed, as to the Altravida, an illegal outfit and enlistment of crew within our waters, constituting a like augmentation, was a violation of the law of nations as well as of municipal laws, a violation of the neutrality of the United States, and infected captures subsequently made with the character of torts, which justified and required a restitution to the parties injured by the misconduct. That while neither a public ship nor her officers are liable to arrest in a neutral court for illegal captures on the high seas, yet this exemption did not extend to prizes in our ports, as to which our courts had the right to exercise their jurisdiction; citing The Cassius (U. S. v. Peters) 3 [Dall.] '3 [U. S.] 121; The Invincible. 1 Wheat. (14 U. S.) 238. That, in cases of violation of neutral territorial jurisdiction, there was no distinction between the capture of public and private armed ships; following The Invincible, supra. That the fact that the goods illegally captured were landed at Norfolk from the capturing public ship, by the express permission of our government, did not vary the case, since it involved no pledge that, if illegally captured, the goods should be exempted from the ordinary operation of our laws. And that the condemnation of the property at Buenos Ayres, during the pendency of this suit, even assuming it to have been regularly made and duly authenticated, could not oust the jurisdiction of the federal courts after it had once regularly attached itself to the cause.]