EDMUND BRIGGS & another *vs.* LIGHT-BOAT UPPER CEDAR POINT.*

SAME *vs.* LIGHT-BOAT LOWER CEDAR POINT.

SAME *vs.* A LIGHT-BOAT NOT NAMED.

If a vessel has been built for the United States for the purpose of being used as a floating light, under an agreement to construct and equip her according to certain specifications annexed, and to the satisfaction and approval of an agent of the United States, and to deliver her in this commonwealth, for a gross sum to be paid by the United States to the builder after her completion, and the builder has completed the same, and received the contract price, and the title to her has vested in the United States, subject to the lien, and possession has been taken of her by the United States, and the spars and rigging been put up, and the lanterns put on board and prepared for use, a lien upon her cannot be enforced in the courts of this commonwealth upon proceedings afterwards commenced, for labor and materials used in her construction.

---

\* These cases were argued at Boston in March 1865.

PETITIONS for the enforcement of liens upon three vessels. After the former decision in one of these cases, reported in 7 Allen, 287, one of the cases was referred to an assessor, and the others to an auditor, upon whose reports judgments were entered in the superior court for the amounts found to be due to the petitioners; and the United States, appearing as claimants, appealed to this court. The facts are stated in the opinion.

*R. H. Dana, Jr. & T. K. Lothrop,* for the United States.

*T. D. Eliot & T. M. Stetson,* for the petitioners.

GRAY, J. The statutes of Massachusetts provide that any person to whom money is due for labor and materials furnished in the construction of a vessel in this commonwealth shall have a lien upon her, which shall be preferred to all other liens except mariners' wages, and shall continue until the debt is satisfied, unless dissolved by his failure to file in the office of the city or town clerk, within four days from the departure of the vessel from the port at which she was when the debt was contracted, a certificate, under oath, of his account, of the name of the person with whom the contract was made, the name of the owner of the vessel, if known, and the name or description of the vessel and which may be enforced by petition to the superior court, containing a statement of the labor and materials, the amount due therefor, a description of the vessel, and all other material facts and circumstances, and praying for a sale of the vessel, and the application of the proceeds to the discharge of the demand. The petition may be entered in court or filed in the clerk's office in vacation, a process of attachment issued against the vessel, and notice given to the owner thereof to appear and answer to the petition, by serving him with an attested copy of the petition and order of notice; or the petition may be inserted in a writ of original summons, with an order of attachment, and served, returned and entered like other civil actions. Gen. Sts. *c.* 151, §§ 12, 13, 15, 16; *c.* 150, § 14. The attachment may be dissolved, as in ordinary civil actions, by the owner of the property giving bond to pay the amount recovered within thirty days after final judgment. Gen. Sts. *c.* 151, § 15; *c.* 123, §§ 104-106. The court may at any time allow either party to amend

his pleadings as in actions at common law. Gen. Sts. *c.* 151, § 17. Any number of persons having such liens upon the same vessel may join in one petition, " and the respondent may defend as to each petitioner." § 18.

In each of the cases now before us, the petitioners, in a petition filed in the clerk's office, alleged that by virtue of a contract with Stephen Andrews they had furnished labor and materials for and on account of a light-boat, which had been used in its construction, and for which a certain amount was now due to them ; that the boat had been built and completed at New Bedford at the ship-yard of Andrews, and had never been removed thence; and that Andrews had since transferred her to the United States, who were now the owners thereof, subject to the lien of the petitioners ; and the petitioners prayed for an attachment and sale of the vessel to satisfy their demand, and for notice to the said owners and all parties interested to appear and answer to the petition. The court thereupon issued a process of attachment against the vessel, and ordered notice to the United States by service on their attorney for this district. The vessel was attached and notice given accordingly; and the United States, by their attorney, appeared specially, and pleaded to the jurisdiction that, at the time of filing the petition, and long before, the vessel was the public property of the United States, and in their possession, and held and owned by them for public uses, and as an instrument employed by them for the execution of their sovereign and constitutional powers, and therefore not subject to the process or jurisdiction of the court; and, saving this plea to the jurisdiction, answered on the merits.

These cases now come before the court upon a statement of facts, of which the pleadings, the assessor's report in the first ase, and auditor's reports in the two others, are made parts, and the substance of which is as follows : These three vessels were intended to be used as floating lights in the Potomac River, and were built by Andrews under an agreement made by him in writing with the United States to construct and equip three light-vessels according to the specifications attached to the agreement, and to the satisfaction and approval of the

superintendent of construction appointed by the light-house board, and to deliver them at New Bedford to the agent of that board, for a gross sum to be paid by the United States to Andrews upon his presenting certificates from such superintendent that the vessels had been completed to his satisfaction and approval. . At the time of the attachment, Andrews had received the certificate of the superintendent and had been paid the contract price; on each vessel the spars and standing rigging were up, and the lanterns had been put on board and fitted for use by men sent for the purpose by the treasury department; the superintendent had received orders to fit out two of the vessels, and those two had their crew, provisions and oil on board, and their armaments ordered; but all three vessels were at the builder's wharf, and had never been in the stream; no orders were in force to send them away, and they would not have been sent away without further orders. After the attachment, the armaments were put on board, and some caulking and joiners' and carpenters' work done.

The establishment, maintenance and control of light-houses and light-vessels appropriately belong to the supreme government of the nation. At common law, no one could erect light-houses, sea-marks or beacons without authority of the king. 3 Inst. 204. 4 Inst. 148. Bac. Ab. Prerogative, B. 6. And by *St.* 8 Eliz. *c.* 13, provision was made for the erection and maintenance of beacons and sea-marks, and for punishing any one who should destroy them. By the constitution of the United States, the control of such things, as part of the power to regulate commerce, was granted to congress, who by one of their first acts assumed this duty, and provided for the support and repair, by the secretary of the treasury, of all light-houses, beacons, buoys and public piers previously placed in any bay, inlet, harbor or port, for rendering the navigation thereof easy and safe. U. S. St. 1789, *c.* 9; 1 U. S. Sts. at Large, 53, 54. The authority of regulating similar structures has since continued in congress, and been exercised by them from time to time. Marshall, C. J., in *Gibbons* v. *Ogden,* 9 Wheat. 208, 209. U. S. St 1820, *c.* 113, § 7; 3 U. S. Sts. at Large, 600. U. S. St. 1838.

*c.* 180, § 3; 5 U. S. Sts. at Large, 292. And in 1852 a light-house board was established, attached to the treasury department, and charged with the duties of constructing, illuminating, inspecting, superintending, supplying and repairing the light-houses, light-vessels, beacons, buoys and sea-marks of the United States. U. S. St. 1852, *c.* 112, §§ 8–17; 10 U. S. Sts. at Large, 119, 120. The existing regulations of the treasury department contain specific directions as to the construction, placing, lights, marks, management and inspection of light-vessels; and specially require that " when a light-vessel, designed for a new light-station, is sufficiently far advanced in construction and equipments to enable the inspector to determine at about what time it will be ready for placing at the light-station, he will prepare and transmit to the light-house board a detailed description of the hull, spars, moorings, illuminating apparatus and day-marks, with a general description of the station to be occupied, and report on or about what day the light may be exhibited; " and that " when the requisite detailed information for preparing the notice of the proposed placing of a light-vessel can be had in advance, it will be transmitted to the light-house board before the vessel is placed at the station." Treasury Regulations of 1857, arts. 1006–1030.

The condition of these three light-boats, when attached in these suits, was briefly this : They had been built for the United States, and accepted and paid for by them, for aught that appears, without any knowledge of the petitioners' lien. The title, as is directly alleged in the petitions, had vested in the United States, subject to the lien. The United States had taken possession of the vessels, and had put on board and fitted for use the lanterns, for the very purpose of carrying which the boats had been built, and which were the distinctive badge of the public service in which they were to be employed.

The question which has now been argued is not of the petitioners' title, but of the mode of asserting it; not of right, but of remedy. The United States do not now deny that they took their title subject to the lien of the petitioners. That point was determined by this court, after full consideration, upon the

former argument of one of these cases. *Briggs* v. *Light-Boat,* 7 Allen, 287. See also *Vanderwater* v. *Mills,* 19 How. 89, 90.

At that argument, the attention of counsel was chiefly, and of the court exclusively, directed to the question of title; it was assumed by the court that the lien carried with it the right to maintain this process; the effect of the possession of the United States upon the possibility of enforcing the lien in this form of proceeding, although involved in the ruling which the superior court had made at the trial, was not considered; and it was by inadvertence, that, following the terms of the report on which the case had been reserved, the court, upon setting aside the verdict for the respondents, directed judgment for the petitioners, and referred the case to an assessor to ascertain and report the amount of the petitioners' claim. The objection that the relation of the United States to this property and these proceedings is such as to take the matter out of the jurisdiction of the state courts, was raised by the United States at the outset, and strikes at the root of these petitions. It is fairly presented by the statement of facts, has been elaborately and ably argued, and must be disposed of before final judgment can be entered. Under such circumstances, the direction given to one of these cases after the previous hearing cannot preclude or excuse us from the most careful consideration of the question whether we have really any power to order a sale of this property as prayed for. And after thorough investigation and mature advisement, it is the unanimous opinion of the court that the difficulties in the way of maintaining these proceedings are insuperable.

It is an elementary and familiar principle of English and American constitutional law, that no direct suit can be brought against the sovereign in his own courts without his consent. In the older books, this is often put upon the technical ground that, all judicial writs being in the name of the king as the fountain of justice, the king cannot by his own writ command himself. But the broader reason is, that it would be inconsistent with the very idea of supreme executive power, and would endanger the performance of the public duties of the sovereign, to subject him to repeated suits as a matter of right, at the will of

any citizen, ana to submit to the judicial tribunals the control and disposition of his public property, his instruments and means of carrying on the government in war and peace, and the money in his treasury.

These are not suits against public officers merely; but are brought against the government itself, as directly as any legal proceeding could be to assert a title or lien in, or obtain possession of, specific property. The United States are alleged in the petitions to be the owners of the vessels. The statutes of the Commonwealth require, and these petitions pray, that notice should issue to them, "that they may appear and answer thereto." Gen. Sts. *c.* 150, § 14; *c.* 151, § 15. It is pursuant to such a notice that they have appeared and pleaded to the jurisdiction.

This is not a case in which notice issues to the government in order that it may, at its election, come in and claim a right to property in the possession of an individual, or of the court. When these suits were begun, the vessels, though the petitioners had an interest in them by way of lien, were the lawful property of the United States, and in their possession. No other person was named in the petitions, or has appeared in court, as a defendant.

Nor is this case like one in which the government has, by bringing a civil action to enforce its own rights to property in the possession of an individual, submitted itself to the jurisdiction of the court, and, being itself the actor, needs the assistance of the court to recover its property.

The United States have never, by general statute or special order, submitted themselves or their rights in this matter to the jurisdiction of the state courts. But, on the contrary, as soon as notified of these petitions, and before answering on the merits, they filed a special appearance, and a plea distinctly setting forth the grounds on which they claimed exemption from the state process.

These vessels were not held by the United States, as property night perhaps be held by a monarch, in a private or personal, rather than in a public or political character. It is difficult to see how the government of a republic can hold any property for

personal or private purposes. But these light-boats were built and held for public objects only, and were unsuitable for any other. They were, in the precise and emphatic language of the plea to the jurisdiction, "held and owned by the United States for public uses, and as instruments for the execution of their sovereign and constitutional powers."

The government thus summoned in as a defendant, and from whose possession these vessels are sought to be wrested by the order of this court, is not the government of the state by whose constitution and laws this court is established and the tenure of office of its judges secured. But it is the supreme government of the nation, to which paramount powers of regu.ating commerce, with foreign nations and between the several states, in peace and war, have been surrendered by the constitution of the United States.

Here was no taking by right of eminent domain, or claim of military necessity, or in any forcible manner, from the persons having liens. Neither, on the other hand, was there a seizure by judicial process of the United States, in order to try a controverted question. But the property was, in its very mode of structure, manifestly intended for the use of the United States. It was delivered to them by the contractor according to the terms of his agreement with them, and the price paid by them to him. The petitioners suffered the title to pass, and the possession to be delivered, to the United States, before they took one step in the state courts to establish their lien. If they had filed their petitions and attached the vessels before these came into the possession of the United States, they might well have contended that the courts of the Commonwealth had acquired a jurisdiction of the cases, which could not be devested until the object of the suits was accomplished.

This process does not wait for final adjudication of the rights of the parties, before it takes the property out of the hands of its owner and possessor; but assumes the custody at the very first stage of the proceedings. And thus, if these petitions can be sustained, any attorney of a state court may cause a public vessel of the United States to be taken out of their possession

without any previous judicial investigation of the petitioner's claim, and at a moment when the exigencies of the public service, known only to the executive department, and which may not safely be disclosed, require its immediate dispatch to a distant station.

The object of this proceeding is not to vest the property in the petitioners, but to have it sold for the payment of their claim; and the whole property, including the title of the United States, is attached and held as security for such payment. No other form of judicial process has been brought to our notice, in which property held by the United States can be attached as security for the payment of any debt, either of themselves or another.

The United States could not, according to these statutes, be restored to the possession of the vessels until after final judgment, except by giving a bond to dissolve the attachment and to pay the amount of any judgment which the petitioners might recover. It is not pretended that any action could be maintained upon such a bond. It would be a most anomalous mode of proceeding, to maintain a suit to compel the United States to give a bond, upon which, when given, no action would lie.

It is said for the petitioners that these light-boats were not upon their stations, and that they were not intended for military service. But after they had once come into the possession of the United States for public uses, whether remaining at the builder's wharf, or at the station of their final anchorage, or on their way from one to the other, they were subject to the exclusive control of the executive government of the United States, and could not be interfered with by state process. The immunity from such interference arises, not because they are instruments of war, but because they are instruments of sovereignty; and does not depend on the extent or manner of their actual use at any particular moment, but on the purpose to which they are devoted. Neither the comparative importance of the different sovereign powers of the United States, nor the management of the instruments of either, when not used so as to injure any citizen, has been submitted to the judgment of the state courts.

These reasons have satisfied us that there is no principle upon which the courts of this commonwealth can entertain jurisdiction of these petitions. A careful examination of all the authorities cited at the bar, and some additional research, have confirmed this opinion. We shall state the result of this investigation with more fulness and detail than would be admissible in a case of less interest and moment.

The petitioners contend that at common law the sovereign could be sued without his consent. But it is, to say the least, very doubtful whether this position can be maintained. The earliest assertion, in an English law book, of the king's liability to an action is probably the statement in the Mirror of Justices. compiled by Andrew Horne in the reign of Edward I. or Edward II., that, at some time between the reigns of Alfred and Edward I., " it was ordained, that the king's courts should be open to all plaints, by which they had original writs without delay, as well against the king or the queen, as against any other of the people, for every injury but in case of life, when the plaint held without writ." And in the chapter on " abusions of the common law," it is complained that " the first and chief abusion is, that the king is above the law, whereas he ought to be subject to it, as it is contained in his oath." Mirror, *c.* 1, § 3; *c.* 5, § 1. But the Mirror is of no great authority in matters of earlier history. 2 Palgrave's English Commonwealth, 113, 114. 2 Reeve's Hist. Eng. Law, 358, 359.

The later statements of the same doctrine are based upon three cases in the Year Books of Edward III., which, when critically examined, hardly warrant the inference, and in none of them was the point in issue or adjudged. The first was of a writ of error granted by the king, on petition, to Sir William Thorp, C. J. K. B., upon a judgment rendered in parliament for the king; " the king assigned certain earls and barons, and with them the justices, &c. to determine the said business," before whom " it was alleged " that the judgment could not be reversed except in parliament, and that, since the parliament was now ended, (" the deputies remained, but the king himself was gone,") nothing further could be done. " And it was said," (whether by

court, or counsel, or in some book cited, does not appear, but there is a curious resemblance between some of the words and those above quoted from the Mirror,) " that the king made the laws by the assent of tne peers and of the commons, and not by the peers and the commons; and that he had no peer in his own land; and that the king ought not to be judged by them; and that in the time of King Henry, and before, the king was impleaded as would be another man of the people; but Edward the king his son ordained that a man should sue the king by petition; but kings should never be judged except by themselves and their justices." 22 Ed. III. 3, pl. 25. *S. C.* in Fitz. Ab. Error, 8. The second is a mere *dictum* of Wilughby, J., who in an action brought by, not against, the king, and after speaking of a petition of right, remarked, " I have lately seen such a writ, *Præcipe Henrico Regi Angliæ, &c.,* instead of which is now given petition by his prerogative." 24 Ed. III. 55, pl. 40. The third is but a statement of counsel in argument. In defending an action brought by the king to recover an advowson, which was appurtenant to a manor granted by King Henry III., but not mentioned in the grant, Cavendish said that " in the time of King Henry, the king was but as a common person, for in that time a man could have a writ of entry *sur disseisin* against the king, and all other kinds of actions, as against another person;" and that before the *St. de Prærogativa Regis* the king's grant, like any other person's, included all fees, advowsons and other appurtenances, though not expressly mentioned. The court gave judgment for the defendant upon the last ground. 43 Ed. III. 22, pl. 12. *Whistler's case,* 10 Co. 64 *a.* It would be difficult to infer from anything said by the judges in these cases, that, either by petition of right, or by writ, a suit could have been brought against the king without his leave.

On the other hand, Bracton, who lived and wrote in the reign of Henry III., repeatedly asserts that a writ does not run against the king. Bract. 5 *b*, 171 *b.* He also says that it follows that the king cannot be vouched to warranty, without his consent; and cites cases in which this had been adjudged. Bract. 261 *a*, 270 *b*, 382 *b.* And this last position is recognized and affirmed

in *c.* 1 of *St.* 4 Ed. I., *St.* 2, commonly called *St. de Bigamis* and in the legal treatises of this reign. 2 Inst. 268. Fleta (Selden's ed.) 285, 294. Britton, 138 *a*, 200 *b*, 216 *b*. Lord Coke says that before a remedy against sheriffs or other bailiffs of the king was given by *St.* 3 Ed. I. *c.* 24, a subject whose freehold was seized into the king's hands by one of those officers, " to his intolerable vexation and delay, was put to his suit to the king by petition." 2 Inst. 206. See Bract. 212 *a*. And Coke reports that while he was at the bar it was resolved by all the judges that at the common law, in all cases where the king was seised of any estate of inheritance or freehold by any matter of record, he who had right " was put to his petition of right, (in nature of his real action which he could not have against the king, because the king by his writ cannot command himself,) to be restored to his freehold and inheritance." *Sadlers' case*, 4 Co. 54 *b*, 55 *a*. The passages quoted by the learned counsel for the petitioners from Bracton and Fleta, as to the control which the king's court might exercise over him, manifestly refer to legislative and not judicial control, in parliament and not in the ordinary courts of justice. Bract. 34. Fleta, 17. 1 Spence on Eq. 125, *note*. 2 Hallam's Middle Ages, *c.* 8, pt. 2, (10th ed.) 332 *and note*, rejecting the theory of Allen on the Prerogative, (2d ed.) 94–97, cited for the petitioners. And the accuracy of the statements in the Year Books of Edward III. has been doubted or denied by such high authorities in the law as Chief Justice Brooke, his colleague Staunford, John Selden, and Chief Justice Erle. Bro. Ab. Peticion, 12; Prerogative, 2, 31. Staunford on the Prærogative, 42. Titles of Honour, Additions No. 275; 3 Selden's Works, 1048. *Tobin* v. *The Queen*, 16 C. B. (N. S.) 356, 357.

The petitioners also cited Rolle's abstract of the argument delivered in the king's bench by Sir Francis Bacon, as attorney general, upon the writ *de rege inconsulto*, in which he is reported to have said, " The matter is, How the king is to be made a party ? That will not be in this court by *Præcipe Jacobo Regi* as he was in ancient times." *Brownloe* v. *Michell*, 1 Rol. R. 290. But Bacon's argument, as prepared by himself in writing

gives a different color to the suggestion. " This foundation being laid, that the king must be made party, then followeth the third point, which is, How he shall be made party? It follows therefore of itself, *ex quâdam necessitate adamantinâ*, that the case can be no longer held in the common pleas or this court, for you will not revive old fables (as Justinian calls things of that nature,) *Præcipe Henrico regi, &c., Præcipe Jacobo regi, &c.* That you will not do; and yet it comes to that, if the king should be made a defender in this court, either directly or indirectly." 1 Coll. Jurid. 176. 7 Bacon's Works, (ed. 1859,) 683, 694.

During the reigns of the earlier Plantagenets, the jurisdiction of the courts depended more or less on the king's pleasure, the king sometimes administered justice in person, and the forms of proceeding between subject and subject were quite unsettled. Glanville, lib. 1, *cc.* 4–6; lib. 12,' *c.* 25. 1 Palgrave's English Commonwealth, 291, 292. 2 Ib. 68, 69. Ryley Pl. Parl. 442, 459. 1 Spence on Eq. 111–127. *Tobin* v. *The Queen*, above cited. And the exorbitant fines paid to the king to obtain justice occasioned the provision in Magna Charta — *Nulli vendemus justitiam.* 1 Hale's Hist. Com. Law, (5th ed.) 263. Madox Hist. Exch. *c.* 12. Doct. & Stud. *dial.* 1, *c.* 8. It can hardly be believed that the subject could have a writ as of course against the king, when he was dependent on the king's favor for the right to sue a fellow-subject.

If actions were maintained against the king in the reigns of John and Henry III., it would not have much weight in ascertaining the lawful extent of the royal prerogative, so great was the power at times exercised by the barons over the crown. The Magna Charta of King John provided that in case of a breach of its provisions by the king, a certain number of the barons, chosen by themselves, " together with the commons of the whole realm, should distress and harass him in every way possible, to wit, by taking of castles, lands and possessions, and other ways possible, until it should be redressed according to their judgment," saving only the persons of the king and the royal family. 1 Statutes of the Realm, 8. And see Acts 42 H. III., 1 Rymer's Fœdera, (Record Commission ed.) 371, 377, 381.

But the question whether the king of England could be sued at common law is rather a matter of historical interest than of present application; for all the books agree that it has not been allowed since the reign of Edward I. See authorities above cited, and also Com. Dig. Action, C. 1; Prærogative, D. 78; Bac. Ab. Prerogative, E. 7; Year Book, 30 Ed. I., 171, 173, 189; *The case of the Constable of England,* Keilw. 171 *b*, 172 *a.*

It has been said that " replevin lies against the king, if goods be in his hands." Com. Dig. Replevin, D. Manning's Exch. Pract. Rev. (2d ed.) 89. But this statement is founded on nothing but a speech, reported in 2 Rushworth's Hist. Coll. 1361, and better in 4 Somers's Tracts, 301, of Edward Hyde (afterwards Lord Clarendon) to the house of lords on the impeachment of the barons of the exchequer, who had issued injunctions thirteen years before to stay such writs brought against officers of the customs by the owners of goods seized for duties. And the reasons given by the court of exchequer to the house of commons at that time fully justify their action. " Whereas the said owners endeavored to take the same goods out of the king's actual possession by writs or plaints of replevin, which was no lawful action or course in the king's case, nor agreeable to his royal prerogative, therefore the said court of exchequer, being the court for ordering the king's revenue, did by those orders and injunctions stay those suits, and did fully declare by the said orders that the owners, if they conceived themselves wronged, might take such remedy as the law alloweth." 1 Rushworth's Hist. Coll. 666. And see *Cawthorne* v. *Campbell,* 1 Anstr. 205 note; Madox Hist. Exch. *c.* 23, § 15; Manning's Exch. Pract. Rev. 190, and note *m;* Com. Dig. Courts, D. 2, 7; 20 Ed. I., 87.

The rule in chancery is the same as at law, as is shown by the case of *Reeve* v. *Attorney General,* cited for the petitioners There lands were devised to the testator's widow for life, and after her death to be sold and the money divided among the plaintiffs; the land, for want of heirs of the testator, escheated to the crown; and a bill brought against the attorney general who was made defendant in behalf of the crown, to have the lands sold, was dismissed by Lord Chancellor Hardwicke, who

said, according to one report, that "where the crown was trustee, the court has no jurisdiction to decree a conveyance, but they must go to a petition of right;" 1 Ves. Sen. 446; or, as elsewhere reported, that he could not make such a decree, but the court of exchequer might, as it was a court of revenue. 2 Atk. 223. In the great case of *Penn* v. *Lord Baltimore*, after the attorney general had been made a party, Lord Hardwicke decreed a specific performance of articles executed in England concerning the boundaries of the Provinces of Pennsylvania and Maryland; but without prejudice to any prerogative, right or interest of the crown. 1 Ves. Sen. 454, 455, and Belt's Suppt. 198. In a later case, Lord Northington, "upon very diligent search and consideration," and after consulting Lord Mansfield and Sir Thomas Clarke, M. R., thought "the arms of equity were very short against the prerogative." *Burgess* v. *Wheate,* 1 Eden R. 255. See also Lord Redesdale in *Hovenden* v. *Lord Annesley*, 2 Sch. & Lef. 617; Mitf. Ch. Pl. (4th ed.) 31.

In the ecclesiastical court, an application for process calling upon the king's proctor, for and on behalf of the reigning king, as heir and successor of the late king, to see a testamentary paper of his propounded and proved, was rejected by Sir John Nicholl, upon the ground that it was, "in substance, not merely a proceeding to try the validity of the will of his late majesty, but a proceeding against the reigning sovereign — a demand upon his majesty, which is to be enforced, adversely, against him." *In the goods of King George III.*, 1 Addams, 255, 266.

A petition of right cannot be prosecuted without leave first obtained from the sovereign, and then only in the court indicated in the royal fiat, which the law will not presume will be capriciously refused. Staunford on the Prærogative, 73. 1 Bl. Com. 243. *Clayton* v. *Attorney General*, 1 Coop. temp. Cottenham, 120. *In re Pering*, 2 M. & W. 873. *Ryves* v. *Duke of Wellington*, 9 Beav. 600, 601. After leave once granted, the cause proceeds like an ordinary suit; and all defences of law or fact are open to the crown. *Baron de Bode's case*, 2 Phillips R. 85; *S. C.* 8 Q. B. 208; 13 Q. B. 364; 3 H. L. Cas. 449. By final judgment for the petitioner, and not before, the possession

of the crown is terminated.   3 Bl. Com. 257.   The petition of
right, after being disused for centuries, was revived in England
about thirty years ago, and afterwards resorted to so frequently
that it became the practice for the secretary of state for the
home department, as a matter of course, to indorse " Let right
be done." Jervis, C. J. in *Eastern Archipelago Co.* v. *The Queen*,
2 El. & Bl. 914.   But the recent English statute, regulating this
mode of proceeding, still recognizes the royal prerogative, by
directing the home secretary to submit the petition " for her
majesty's gracious consideration, and in order that her majesty,
if she think fit, may grant her fiat that right be done." *St.* 23
& 24 Vict. *c.* 34, § 2.   *Irwin* v. *Grey*, 3 Fost. & Finl. 635.
*Tobin* v. *The Queen*, 14 C. B. (N. S.) 521, 522.

The only other mode, known to the law of England, in which
a subject could assert a title by legal proceedings against the
king, was either by *monstrans de droit* or manifestation or plea
of right, or by traverse of an inquisition or office found for the
king.   But each of these was in the form of a plea, beginning
with the words *Et modo ad hunc diem venit et pro placito, &c.,*
both appear to have been used only in answer to proceedings
instituted by the king for seizing property into his hands; and
the judgment, if in favor of the subject, was simply *quod manus
domini a possessione amoveantur.*   *Sadlers' case,* 4 Co. 54; *S. C.*
Co. Entr. 402.   Jenk. 78.   Com. Dig. Prærogative, D. 81–84.
Manning's Exch. Pract. Rev. 87, 88, 89.   *People* v. *Cutting,*
3 Johns. 6, 7.

The English revenue cases, cited for the petitioners, were of
this character, in which inquisitions had been taken upon extents
sued out by the king against crown debtors.   The factor's and
wharfinger's liens which were maintained against the crown
were created before the teste of the extent, and pleaded by way
of traverse of the inquisition.   *The King* v. *Lee,* 6 Price, 369.
*The King* v. *Humphery,* McClel. & Y. 173.   The passage cited
from Bro. Ab. Pledges, 31, that " if a man pledge his goods and
afterwards is attainted of felony, the king shall not have the
goods pledged without paying the sum for which they were
pledged," goes no farther.   In *Casberd* v. *Attorney General,*

6 Price, 411, the estate of a crown debtor had been seized upon an extent, and ordered by the court of exchequer to be sold; and Chief Baron Richards, in maintaining a bill in equity by an equitable mortgagee to be first satisfied out of the proceeds, said: " I do not know, if the crown had had the legal estate here, how I should have got it out of the crown's hands for the benefit of the person who would have been a *cestui que trust.*" 6 Price, 463. The case of *Poole* v. *Attorney General,* Parker, 272, is to the same effect.

Like decisions have been made by judges of the same court, sitting in equity, in cases of forfeitures for treason or felony. In the reign of Charles II., when lands had come into the king's actual possession upon the attaint of the mortgagee for high treason, Lord Hale said, " In natural justice redemption of a mortgage lies against the king;" yet expressed the opinion that a bill in equity could not be maintained to compel the king to reconvey, but the only remedy was by " an *amoveas manum.*" Baron Atkyns dissented, and no final decree appears to have been made. *Pawlett* v. *Attorney General,* Hardr. 467, 469. *S. C.* cited in 1 Eden R. 205, 255. But early in the next century, upon a bill against the attorney general to foreclose a mortgage after the attaint of the mortgagor for high treason, the court, as reported by Lord Hardwicke, then attorney general, " would not decree a foreclosure against the crown, but directed that the mortgagee should hold and enjoy the mortgaged premises till the crown thought proper to redeem the estate." *Lutwich* v. *Attorney General,* cited in 2 Atk. 223. On a similar bill by equitable mortgagees of the estate of one convicted of felony, Baron Alderson decreed that the plaintiffs should hold possession of the property until the heir was satisfied, but declined to order a sale, because the legal estate was in the crown. *Hodge* v. *Attorney General,* 3 Yo. & Col. Exch. 342. In these two cases, the king had manifestly neither made an entry, nor sued out a writ of escheat, one or the other of which was necessary to perfect his title. 2 Bl. Com. 445. See also *Rogers* v. *Maule,* 1 Yo. & Col. Ch. 4, in which the decree made was by consent of the attorney general; *Wikes's case,* Lane, 54.

In the celebrated *Case of the Bankers*, 14 Howell's State Trials, 1, the house of lords, affirming the judgment of the court of exchequer, and following the opinion of Lord Holt and a majority of the judges, ordered payment out of the exchequer of the arrears of annuities granted by Charles II. chargeable upon the hereditary revenue of excise in consideration of large loans of money from the bankers. But the original royal grant contained express directions to the officers of the exchequer from time to time to pay the arrears of the annuities out of the funds in the exchequer, without further orders; the opinions given in favor of the bankers rested upon the peculiar powers of the barons of the exchequer over the revenue, such as no court has in this country; and the judgment was opposed to the great authority and profound constitutional learning of Lord Somers. No instance has been found, in which either the court of exchequer or any other English court has maintained a suit against the king, except either by his consent, or in answer to a proceeding instituted by himself.

In the United States, it has always been held an essential attribute of sovereignty in a state not to be liable to be sued without its own consent; and that consent has not usually been given except in special cases. The law of this commonwealth affords sufficient examples. The general principle that the state cannot be sued, at law or in equity, is perfectly well settled. *Commonwealth* v. *André's Heirs*, 3 Pick. 225. *Pingree* v. *Coffin*, 12 Gray, 321. The best example for our present purpose is the decision of this court that the interest in the nature of dower, given by the *St.* of April 30th 1779, *c.* 9, § 4, to widows whose husbands' property had been confiscated to the state, needed an express provision to authorize the courts to set it off, because, in the words of Chief Justice Parsons, " the government being the tenant of the freehold, they could have no remedy at law to obtain an assignment of dower, but must have relied on the justice of the government." *Sewall* v. *Lee*, 9 Mass. 370. The saying of Lord Hale, that " in natural justice redemption of a mortgage lies against the king," has been put in practice here by authorizing suits to be brought against the Commonwealth

for the redemption of mortgages made or assigned to it. *St* 1804, *c.* 103, § 2. Rev. Sts. *c.* 107, §§ 38, 39, and commission ers' notes. Gen. Sts. *c.* 140, § 48. The Massachusetts statutes concerning escheats well illustrate the nature of the English remedies against the crown, already mentioned. The inquest of office necessary to vest the title in the state is upon informa- tion by the attorney general, to which any person, though not named therein nor served with process, may appear and answer; and if judgment is rendered for the Commonwealth, any one who has not been served with process or appeared may, within the period of limitation of real actions, bring a writ of entry against the Commonwealth, its tenant or grantee, and deny and disprove any facts alleged in the first suit, and also allege and prove any other facts in support of his claim, and, if entitled to the premises, have judgment and execution therefor in common form. *Wilbur* v. *Tobey,* 16 Pick. 180. Rev. Sts. *c.* 108. Gen. Sts. *c.* 141. The defence to the original proceeding resembles the traverse of office or *monstrans de droit;* and the subsequent suit, after the estate has vested in the Commonwealth, " answers," in the words of the commissioners on the Revised Statutes, " to the petition of right at common law." Rep. of Commissioners on Rev. Sts. *c.* 108, §§ 13, 14, *note.*

The constitution of the United States, as originally adopted, gave to the federal courts jurisdiction both of " controversies be- tween two or more states," (which could not be judicially deter- mined otherwise than in the national tribunals,) and of those " between a state and citizens of another state." But Hamil- ton, Madison and Marshall originally maintained that this last clause must be limited to suits in which a state was plaintiff. Federalist, No. 81. Debates in Virginia Convention of 1788, 3 Elliot's Debates, (2d ed.) 533, 555, 556. The judgment of a majority of the supreme court, giving it a wider meaning, created so much dissatisfaction, that the constitution was immediately amended by declaring that " the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or citizens or subjects of

any foreign state;" and no suit has since been brought by an individual against a state in the United States courts. *Chisholm* v. *Georgia*, 2 Dall. 419. U. S. Constitution, amendment 11. *Cohens* v. *Virginia*, 6 Wheat. 406, 407. *Ex parte Madrazzo*, 7 Pet. 627. The suits in which the supreme court of the United States has taken jurisdiction of a writ of error by an individual against a state to reverse a judgment of a state court have been either originally brought by the state, or brought against the state in its own courts by its own consent given by its constitution and laws. *Cohens* v. *Virginia*, 6 Wheat. 264. *Curran* v. *Arkansas*, 15 How. 304.

It is equally well settled that, without the assent of the United States, no action at law can be maintained against them in their own courts; nor a bill in equity to restrain the United States from collecting a judgment obtained at law, even on the ground that it has since been paid. *United States* v. *Clarke*, 8 Pet. 444. *United States* v. *M'Lemore*, 4 How. 286. *Hill* v. *United States*, 9 How. 386. *Reeside* v. *Walker*, 11 How. 290. *Nations* v. *Johnson*, 24 How. 204. In the first of these cases, Chief Justice Marshall said: " As the United States are not suable of common right, the party who institutes such suit must bring his case within the authority of some act of congress, or the court cannot exercise jurisdiction over it." Such authority has been given in a few classes of cases, most commonly in those analogous to proceedings in the English exchequer as a court of revenue, or concerning claims to property acquired by the United States by treaty. From an early period, set-offs, legal and equitable, have been allowed in suits brought by the United States. *St.* 1797, *c.* 20; 1 U. S. Sts. at Large, 512. *Gratiot* v. *United States*, 15 Pet. 370; *S. C.* 4 How. 80. *United States* v. *Bank of Metropolis*, 15 Pet. 403. By the act of 1820, *c.* 107, upon the issue of a warrant of distress against a delinquent receiver of public money, he might have a bill in equity against the United States in the district court. 3 U. S. Sts. at Large 592. *United States* v. *Nourse*, 6 Pet. 470; *S. C.* 9 Pet. 8. *Murray* v. *Hoboken Land Co.* 18 How. 283, 284. By the act of 1822, *c.* 96, §§ 6–9, the proprietors of land taken and sold to

make certain public improvements in the city of Washington were "permitted and authorized to institute a bill in equity in the nature of a petition of right against the United States." 3 U. S. Sts. at Large, 692, 693. *Van Ness* v. *City of Washington*, 4 Pet. 276, 277. By the act of 1849, *c.* 107, § 8, suits in equity might be brought to enforce claims to share in the money received from Mexico under the treaty of Guadalupe Hidalgo, and any injunction thereupon granted by the court was to be respected by the treasury department. 9 U. S. Sts. at Large, 94. *Clark* v. *Clark*, 17 How. 317, 320. And several acts of congress have authorized petitions against the United States in their own courts to assert rights under grants from foreign governments in lands since ceded by those governments to the United States. But the only general provision made by congress for a trial of claims against the United States has been by the acts establishing a court of claims, providing a mode of proceeding by petition, and declaring a copy of a judgment for any petitioner to be a sufficient warrant to the secretary of the treasury to pay the amount out of any appropriation made by congress for the payment of private claims. No authority has been given to issue compulsory process against the United States for the payment of any claim, and the court of claims has been held by the supreme court not to be a judicial tribunal from which an appeal could be taken to that court, although such an appeal was given in terms by the statutes. U. S. St. 1855, *c.* 122; 10 U. S. Sts. at Large, 612. U. S. St. 1863, *c.* 92; 12 U. S. Sts. at Large, 765. *Gordon* v. *United States*, 14 Amer. Law Reg. 111; *S. C.* 2 Wallace, 561.

The act of congress of June 11th 1864, *c.* 117, passed while these suits were pending, authorizing the secretary of the treasury to cause a stipulation, to the extent of the value of the interest of the United States, to be made for the discharge of any property owned or held by the United States and seized or attached in judicial proceedings under the laws of a state, (as has since been done in these cases,) and defining the effect of a final judgment for the plaintiff after a stipulation so given, expressly provides that "nothing herein contained shall be considered as

recognizing or conceding any right to enforce by seizure, arrest, attachment or any judicial process, any claim against any property of the United States, or against any property held, owned or employed by the United States, or by any department thereof, for any public use, or as waiving any objection to any proceeding instituted to enforce any such claim." 13 U. S. Sts. at Large, 123.

The case of *Florida* v. *Georgia*, 17 How. 478, was a suit brought by one state against another to settle a disputed boundary; a majority of the supreme court, while allowing the attorney general to appear and adduce proofs in behalf of the United States, still held that no judgment could be given against the United States; and four dissenting justices were of opinion that the United States could not take any part in the case. In the New York cases cited for the petitioners, a state was made a party defendant merely for the purpose of enabling it to protect its rights, and it was admitted that no compulsory decree could be made against it. *Garr* v. *Bright*, 1 Barb. Ch. 157. *Manning* v. *Nicaragua*, 14 How. Pract. R. 517. See also *United States* v. *Peters*, 5 Cranch, 139; *Duke of Brunswick* v. *King of Hanover*, 6 Beav. 39.

Two other opinions of the supreme court strongly tend to support the position here taken by the United States, although each perhaps went beyond what was absolutely necessary to the judgment. In *Harris* v. *Dennie*, 3 Pet. 292, foreign goods, still in the vessel in which they had been imported, and in the possession of the collector of the customs, who had refused security offered for the payment of the duties thereon, were held not to be liable to attachment on a writ from the state courts against the importer. Mr. Justice Story, who delivered the opinion of the court, after alluding to the provisions of the act of congress of 1799, *c.* 128, (sess. 3, *c.* 22,) prohibiting the unlading or removal of goods without a custom-house permit, laid down this broad position: "From the moment of the arrival in port, the goods are, in legal contemplation, in the custody of the United States, and every proceeding which interferes with or obstructs or con trols that custody is a virtual violation of the provisions of the

act." 3 Pet. 304. In *Buchanan* v. *Alexander*, 4 How. 20, it was held that money in the hands of a purser in the navy, due to seamen for their wages, could not be attached by process from the state courts ; and this not solely upon the ground that the purser was not the debtor of the seamen, but also because " the funds of the government are specifically appropriated to certain national objects, and if such appropriations may be diverted or defeated by state process or otherwise, the functions of the government may be suspended."

But the most direct authorities upon the question under examination are to be found in the courts of admiralty, from which this kind of remedy is derived.

*The Betsey* and *The Rising States*, cited by the learned counsel for the petitioners, decided in the English court of admiralty in 1777, and briefly reported in Marriott R. 80, 82, were cases of recaptures from the Americans during the Revolutionary War, and arose under the act of parliament of 1775, known as the American Prohibitory Bill. That act provided that the captors of ships and cargoes belonging to the inhabitants of the revolted colonies should have the sole property in them, " being first adjudged lawful prize in any of his majesty's courts of admiralty ; " and that if any ship taken as prize, or any goods therein, should appear and be proved in the court of admiralty " to have belonged to any of his majesty's subjects " remaining in their allegiance, taken by the enemy and retaken, they should by decree in admiralty be adjudged to be restored to their former owners, they paying one eighth part of their value in lieu of salvage to the recaptors. *St.* 16 Geo. III. *c.* 5, §§ 2, 24. The cases in Marriott must therefore have been prize proceedings by recaptors to perfect their right or interest in property in their own hands, of which the navy board or the king's proctor came in as claimant; not suits by a private person to enforce a lien on property in the possession of the crown; and it was justly held that upon a liberal construction of the statute, and by the general principles of admiralty law, the king could not have restitution of his transport ship or his stores, without paying to the libellants the military salvage for

recapture. In the United States, salvage is allowed in such cases by statute. U. S. St. 1800, *c.* 14, § 2; 2 U. S. Sts. at Large, 17. *St.* 1864, *c.* 174, § 29; 13 U. S. Sts. at Large, 314.

*The Copenhagen,* 1 C. Rob. 289, was a prize cause, in which both ship and cargo had been restored to the claimants; and the only questions reported concerned the settlement of accounts between the owners of the ship and the owners of the cargo, in which neither the sovereign nor the captors had any interest.

In *The Lord Nelson,* Edw. Adm. 79, civil salvage was allowed on the instance side of the court of admiralty against a government transport. But she had been captured and abandoned by the enemy, and found by the salvors in the situation of a derelict, not in the possession of the crown; nor does the report show that she was crown property; she may have been the property of subjects, which had been chartered by the government. And no question of jurisdiction seems to have been raised.

Whenever the question has been raised, courts of admiralty have generally declined to take jurisdiction of a libel *in rem* against a public ship, without the consent of the government.

Seamen's wages, which are preferred claims, as well under the general maritime law, as by the express words of the statute on which these petitions are founded, cannot be enforced against a government vessel. In a case before Judge Hopkinson in the admiralty court of Pennsylvania, during the war of the Revolution, " on a plea to the jurisdiction, it was adjudged, that mariners enlisting on board a ship of war, or vessel belonging to a sovereign independent state, cannot libel against the ship for wages due." *De Moitez* v. *The South Carolina,* Bee, 422. On a libel in the English court of admiralty to enforce a lien for seamen's wages against a packet employed in the service of the general post-office, though owned by private individuals, Sir William Scott said that he could not but be alarmed at the danger which he apprehended might arise to the public service from the detention of vessels of this kind; and would not assume jurisdiction until informed that the post-office made no objection. *The Lord Hobart,* 2 Dods. 103.

Even for salvage services, but for which a public ship might have been utterly lost to the government, no suit can be maintained. Sir William Scott, as was stated in his presence by the king's advocate, Sir Christopher Robinson, without contradiction, declined to entertain libels for salvage against an English vessel of war. *The Comus,* cited in 2 Dods. 464. In the case of a ship chartered by the government, and having on board a lieutenant in charge of naval and ordnance stores, and some invalid soldiers, when a suit for salvage was brought against ship, cargo and freight, and appearance entered and bail given for ship and freight only, it appearing that the libellants' services had been of great merit and risk, Sir John Nicholl expressed an opinion that there ought to be a remuneration in respect of the stores, and suspended the hearing in order that the matter might be represented to the lords of the admiralty, who thereupon submitted the amount of salvage on the stores to the jurisdiction of the court. *The Marquis of Huntly,* 3 Hagg. Adm. 247. So in the district court of the United States in Florida, Judge Marvin held that the mails could not be arrested or detained for salvage. *The Schooner Merchant,* cited in Marvin on Wreck & Salvage, § 122. And in a very recent case in the district court of the United States for the southern district of New York, Judge Shipman, after careful consideration of previous decisions, held that a libel for salvage could not be maintained against a ship owned, manned, supplied and armed by the United States, though not commissioned in the navy, but used as a transport. *The Thomas A. Scott,* 10 Law Times, (N. S.) 726.

The same rule and practice have prevailed in suits in the nature of proceedings *in rem* for collision, when by mismanagement of a public ship a private vessel has been injured. Dr. Lushington declined to take jurisdiction, except on voluntary appearance in behalf of the lords of the admiralty, of a suit for collision against a troop ship of the crown, and said that Lord Stowell had declined to issue a monition in a similar case. *The Athol,* 1 W. Rob. 379. In the subsequent case of *The Birkenhead,* 3 W Rob. 75, in which Dr. Lushington entertained

such a suit against a steam vessel of war, it appears by another report in 6 Notes of Cases, 365, 366, that the lords of the admiralty had " directed an appearance to be given for the steamer," the crown thereby submitting the matter to the jurisdiction of the court. See also *The Volcano*, 2 W. Rob. 337 ; *S. C.* 3 Notes of Cases, 210. And it may be presumed that similar authority was shown in the other reported cases of libels for salvage or collision against government vessels, in which no question of jurisdiction appears to have been made. A transport arrested under a warrant from the Irish court of admiralty in a cause of collision was released by that court upon its being shown that she was the property of the crown and employed in the public service. *The Resolute*, 33 Law Times, 80. In all such cases the party injured has been left to his remedy *in personam* against the wrongdoer, unless the government has seen fit to assume the responsibility. *Rogers* v. *Rajendro Dutt*, 13 Moore P. C. 236. *The Swallow*, 1 Swabey Adm. 30. *The Inflexible*, Ib. 32.

In the district court of the United States for Maryland, Judge Winchester expressed the opinion that a ship carpenter could not libel a public ship of the United States ; saying, " The adversary proceedings of a court of judicature can never be admitted against an independent government, or the public stock or property." In the same case it was adjudged that an innkeeper who, under a claim of lien for their keep, detained horses owned by individuals and employed in transporting the United States mail, was liable to an indictment for wilfully obstructing the mail. *United States* v. *Barney*, 3 Hall's Law Journal, 128. The decision of Mr. Justice Washington in *United States* v. *Hart*, Pet. C. C. 390, to which the petitioners referred as overruling that case, was simply that the driver of a mail carriage, driving through a populous city at such a rate or in such a manner as to endanger the safety of the inhabitants, was guilty of a breach of the peace at common law, and liable to be arrested by a constable of the city, without making the latter guilty of wilfully stopping the mail.

In *The St. Jago de Cuba*, 9 Wheat. 409, and *United States* v *Wilder*, 3 Sumner, 308, the United States were not defendants

but plaintiffs, and therefore, upon the plainest principles of justice and the well settled rules of law, could not obtain the property in controversy without paying off the liens set up in defence. 2 Spence on Eq. 32, 33, 774. *Sewall* v. *Lee,* 9 Mass. 368. Their position resembled that of the crown in the English revenue cases above cited.

The case of *The St. Jago de Cuba* arose upon an information to enforce the forfeiture of a ship for violation of the acts of congress prohibiting the slave trade; and the point decided was that claims of seamen and material men for services performed and supplies furnished in good faith after the criminal act and before the filing of the information must be first paid out of the proceeds in the registry.

The case of *United States* v. *Wilder,* on which the petitioners much rely, was an action of trover, brought by the United States against the owners of a vessel, which had met with a disaster the subject of general average, to recover clothing on board belonging to the United States, without paying a contribution to the average. The clothing was not in the possession of the United States, and no suit in which the United States were a party defendant at law or equity, or claimant in admiralty, had been brought either *in personam* or *in rem.* " The sole question," as stated by Mr. Justice Story at the outset of his opinion, was, " whether there exists a right of lien for the general average due on the goods belonging to the United States, under the circumstances stated by the parties." And it was decided that the owners of the ship, whose duty it was to adjust the general average, were not bound, without receiving a contribution to the average loss, to surrender the clothing to the United States, and thus postpone the whole adjustment until after an opportunity to apply to congress. The learned judge, while avoiding as unnecessary the expression of any absolute opinion upon the point, admitted that " it may be true that no lien exists for repairs of a public ship, or for materials furnished therefor, or for wages due to the crew thereof, or for work and labor performed upon the arms, artillery, camp equipage, and other warlike equipments of the government," or " for salvage services

to public ships of our own government," and that in many other cases, some of which were alluded to in the opinion of Judge Winchester, above cited, " the inference against a lien might be equally cogent." His remark that " the very circumstance that no suit would lie against the United States in its sovereign capacity would seem to furnish the strongest ground why the remedy *in rem* should be held to exist," must be applied to the remedy *in rem* then before him, by detaining, not by process. And the other passages cited from his opinion were but *obiter dicta.*

The only decision favorable to the maintenance of these petitions, which has been cited, is that of Judge Willson of the district court of the United States for the northern district of Ohio, in *The Revenue Cutter No.* 1, 21 Law Reporter, 281. But no authorities were there referred to, except one of Mr. Justice Story's *dicta* in *United States* v. *Wilder*, and the distinction between title and remedy was not noticed. We cannot regard that case as of any weight in opposition to all the other authorities. It may be added that, as that was a libel to enforce a lien for building a ship not on tide waters, it would seem to have been a case of which, according to the recent decisions of the supreme court, the courts of the United States had no jurisdiction. *Roach* v. *Chapman*, 22 How. 132. *The St. Lawrence*, 1 Black, 531.

The cases in which a foreign sovereign or his public property has been held exempt from the jurisdiction of the judicial tribunals are worthy of notice in this connection.

In the leading case of *The Schooner Exchange*, it was held by the unanimous judgment of the supreme court of the United States, delivered by Chief Justice Marshall, that a public ship of war of a foreign sovereign at peace with this country, coming into its ports, was exempt from the jurisdiction of the courts of the United States, (although she had been the private property of an American citizen until confiscated by that sovereign in a foreign port within his control,) upon the ground that a ship of war is employed by her sovereign for national objects, which cannot be interfered with by a foreign state without affecting his independence and his dignity; that therefore the implied

license, under which she enters the port of a friendly power open for her reception, must be construed as containing an exemption from the jurisdiction of that power; and those general statutory provisions, descriptive of the ordinary jurisdiction of the judicial tribunals, which give an individual a right to reclaim his prop-- erty in the courts of the country in which it is found, ought not to be so construed as to give them jurisdiction in a case in which the sovereign power has impliedly consented to waive its juris- diction. 7 Cranch, 116, 144, 146. Sir William Scott, in a later case, hesitated to sustain a libel for salvage by English sailors against a Dutch ship of war; but the Dutch government sub- mitted the case to his award, so that no formal judgment was given upon the question of jurisdiction. *The Prins Frederik,* 2 Dods. 484; *S. C.* cited in 17 Q. B. 212, 213.

Chief Justice Marshall assumed as an axiom of public law that " an independent foreign sovereign cannot be sued." *Os- born* v. *Bank of United States,* 9 Wheat. 870. 7 Cranch, 137. If indeed a foreign sovereign voluntarily comes into an English court as plaintiff in a suit, he stands with reference to that case like any other suitor, and may therefore be obliged at law to give security for costs, and in equity to answer on oath to a cross bill. *Emperor of Brazil* v. *Robinson,* 1 Nev. & P. 817; *S. C.* 8 Ad. & El. 801. *Hullet* v. *King of Spain,* 1 Dow & Clark, 174; *S. C.* 1 Clark & Fin. 333; 7 Bligh N. R. 359. But a foreign sovereign is not subject to suit in England for acts done in his sovereign capacity in his own country, even though himself a born subject of England and a peer of the realm, and having as such taken the oath of allegiance and sat in the house of lords since his accession to his own crown, and now resident in England. *Duke of Brunswick* v. *King of Hanover,* 6 Beav. 1; *S. C.* 2 H. L. Cas. 1. And the court of queen's bench has held that property of a foreign sovereign in England could not be taken upon a process of foreign attachment. *Wadsworth* v. *Queen of Spain,* and *De Haber* v. *Queen of Portugal,* 17 Q. B. 171.

The decision in *The Santissima Trinidad,* 7 Wheat. 283; *S. C.* 1 Brock. 478 that prize ships or goods, captured by a foreign

armed ship on a cruise for which she had been fitted out in a port of the United States in violation of our neutrality, might be restored at the suit of the owner in the courts of the United States sitting as courts of prize, was governed by the principles of international law, by which a capture made by a ship on a cruise originating in such a violation of neutral territory gives the captor, as against the neutral, no right to the property captured, and the prize courts of the neutral, as administering the law of nations, may restore the property, if found within their jurisdiction, to the party injured. Wheaton's International Law, pt. 4, *c.* 2, § 14; *c.* 3, §§ 11–13. Halleck's International Law, *c.* 22, §§ 22–24. 1 Phillimore's International Law, 371. 3 Ib. 452–456.

The exemption of a public ship of war of a foreign government from the jurisdiction of our courts depends rather upon its public than upon its military character. The implied consent to the admission of a public ship of a foreign government into our ports should be allowed no greater effect than the grant by the people of the United States in the Constitution to their own national government of the right to establish light-vessels for the conduct of war or the protection of commerce. And no reason can be suggested why a foreign government should have greater privileges from suit in the courts of this commonwealth than the supreme government of the country.

In every aspect in which we can look at these suits, in the light of principle or of authority, we cannot escape the conclusion that the state courts have no jurisdiction or right to entertain them, and our judgment must therefore be

*Petitions dismissed, without costs*